UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

| | | |
|---|---|---|
| TERESA A. CORDELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No: 4:09-cv-19 |
| | ) | Mattice/Carter |
| MICHAEL S. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This action was instituted pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the final decision of the Commissioner denying the plaintiff a period of disability, disability insurance benefits, and supplemental security income under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 416(I), 423, and 1382. [1]

This matter has been referred to the undersigned pursuant to 28 U.S.C. § 636(b) and Rule 72(b) of the Federal Rules of Civil Procedure for a report and recommendation regarding the disposition of plaintiff's motion for judgment on the pleadings (Doc. 11) and defendant's motion for summary judgment (Doc. 15).

For the reasons stated herein, I RECOMMEND the decision of the Commissioner be AFFIRMED.

### Plaintiff's Age, Education, and Past Work Experience

Plaintiff was 53 years old at the time of the administrative decision and was age forty-eight

---

[1] Since the relevant DIB and SSI regulations cited herein are virtually identical, citations will only be made to the DIB regulations, found at 20 C.F.R. §§ 404.1500-404.1599. The parallel SSI regulations are found at 20 C.F.R. §§ 416.900-416.999, corresponding to the last two digits of the DIB cites (e.g., 20 C.F.R. § 404.1545 corresponds with 20 C.F.R. § 416.945).

on her alleged onset date (Tr. 11, 21, 834)).  Plaintiff has a high school education and past

relevant work experience as a pharmacy tech and sales clerk, which are light, semi-skilled jobs

(Tr. 847, 850).

Applications for Benefits

Plaintiff seeks judicial review of the Social Security Administration's (Agency) final

decision denying her December 10, 2004 application for a period of disability and Disability

Insurance Benefits (DIB) under Title II of the Social Security Act (Act), 42 U.S.C. § 423(d), and

for Supplemental Security Income (SSI) under Title XVI of the Act, 42 U.S.C. § 1382c(a)(3),

alleging a disability onset date of October 15, 2002 (Tr. 11).

Plaintiff testified that she suffers from fibromyalgia; chronic right knee pain after two

surgeries; a chronic ingrown toenail after several surgeries; recurrent basal cell and squamous

carcinoma; irritable bowel syndrome; and depression (Tr. 836-45).  She testified that she was

unable to work due mainly to pain in her back and legs and that she was prescribed anti-

inflammatory medication and received injections in her back (Tr. 836).  Plaintiff further indicated

she was able to walk, stand, or sit for no more than five minutes before she would need to change

position (Tr. 840).

Plaintiff's date last insured (DLI) was December 31, 2003 (Tr. 11).[2]  After a hearing

before an Administrative Law Judge (ALJ), the ALJ issued a decision in which she found that

---

[2] A claimant applying for DIB cannot be found disabled under Title II of the Act unless
her "insured status is also met at a time when the evidence establishes the presence of a disabling
condition(s)."  See 42 U.S.C. § 423 (a)(1)(A); 20 C.F.R. § 404.131; *Higgs v. Bowen*, 880 F.2d
860 (6th Cir. 1988).  In order to be eligible to receive DIB, Plaintiff therefore had to show that
she was disabled on or before December 31, 2003 (See Tr. 11).  There is no insured status
requirement for SSI.

2

Plaintiff was not disabled at any time through the date of the ALJ's decision (Tr. 20). On May 15, 2008, the Appeals Council denied Plaintiff's request for review of the ALJ's decision (Tr. 8-10), thereby rendering the ALJ's decision the Agency's final decision for purposes of judicial review. 20 C.F.R. § 404.981. The Court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

<u>Standard of Review - Findings of the ALJ</u>

Disability is defined as the inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §423(d)(1)(A). The burden of proof in a claim for Social Security benefits is upon the claimant to show disability. *Barnes v. Secretary, Health and Human Servs.*, 743 F.2d 448, 449 (6th Cir. 1984); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978). Once, however, the plaintiff makes a prima facie case that he/she cannot return to his/her former occupation, the burden shifts to the Commissioner to show there is work in the national economy which he/she can perform considering his/her age, education and work experience. *Richardson v. Secretary, Health and Human Servs.*, 735 F.2d 962, 964 (6th Cir. 1984); *Noe v. Weinberger*, 512 F.2d 588, 595 (6th Cir. 1975).

The standard of judicial review by this Court is whether the findings of the Commissioner are supported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 28 L. Ed. 2d 842, 92 S. Ct. 1420 (1971); *Landsaw v. Secretary, Health and Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986). Even if there is evidence on the other side, if there is evidence to support the Commissioner's findings they must be affirmed. *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir.

3

1971).  The Court may not reweigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion.  The substantial evidence standard allows considerable latitude to administrative decision makers.  It presupposes there is a zone of choice within which the decision makers can go either way, without interference by the courts.  *Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Secretary, Health and Human Servs.*, 790 F.2d 450 n. 4 (6th Cir. 1986).

As the basis of the decision of May 15, 2008 that plaintiff was not disabled, the ALJ made the following findings:

1. The claimant met the insured status requirements of the Social Security Act through December 31, 2003.

2. The claimant has not engaged in substantial gainful activity since October 15, 2002, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.,* 416.920(b) and 416.971 *et seq*.).

3. The claimant has the following severe combination of impairments: history of two right knee arthroscopic surgical procedures; history of surgical removal of multiple skin melanomas; fibromyalgia; history of celiac sprue and/or irritable bowel syndrome; and mood disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she has limited but satisfactory ability to deal with the public; maintain attention and concentration; respond appropriately to changes in the work setting; and complete a normal work week.

6.     The claimant is capable of performing past relevant work as a pharmacy
       technician and a sales clerk. This work does not require the performance
       of work-related activities precluded by the claimant's residual functional
       capacity (20 CFR 404.1565 and 416.965).

7.     The claimant has not been under a disability, as defined in the Social
       Security Act, from October 15, 2002, through the date of this decision (20
       CFR 404.1520(f) and 416.920(f)).

(Tr. 13-20).

<u>Issues Presented</u>

1.     The ALJ erred by rejecting disabling medical opinions from three of Plaintiff's
       treating specialists despite compelling evidence supporting these opinions.

2.     The ALJ erred by failing to address and discuss the treating source opinion and
       treatment records from Plaintiff's treating chiropractor, in violation of SSR 06-03p.

<u>Review of Relevant Medical Evidence</u>

Plaintiff periodically complained of pain in some of her toenails from August 2002

through October 2004 (Tr. 778-812).  Dr. Robert Spalding, a podiatrist, diagnosed her with

fungal infections and prescribed Lamisil, an anti-fungal antibiotic (Tr. 778-812).

In 2003, Dr. Nicholas Petrochko removed benign skin lesions and lesions which tested positive

for basal cell carcinoma[3] from Plaintiff's body on three occasions (Tr. 281-84; 326-27, 338-40).[4]

An MRI of Plaintiff's right knee taken in October 2003 showed some minor signal changes in

her cartilage and a tiny cyst that did not warrant surgical removal (Tr. 549).  An MRI of

---

[3] This is the most common type of non-melanoma skin cancer; the most easily treated;
and the least likely to spread. www.mayoclinic.com/health/basal-cell-carcinoma/DS00925 ,
(Doc. 16, Defendant's Memorandum, p. 3).

[4] Plaintiff had a history of melanoma (a form of skin cancer) on her right forearm and
other sun-induced cancers which Dr. Petrochko excised from 1999 through 2001 (Tr. 285-301,
328-31, 358-59, 532, 681-82, 693) (Doc 16, Defendant's Memorandum, p. 3).

5

Plaintiff's lumbosacral spine taken in November 2003 was "completely unremarkable and showed no significant pathology whatsoever" (Tr. 549).

In March 2004, Plaintiff went to Dr. Michael Payne, complaining of frequent diarrhea and anal incontinence (Tr. 708-17, 722-23). He indicated that Plaintiff possibly suffered from irritable bowel syndrome (IBS) (Tr. 723). In April and May 2004, Dr. Payne provided a provisional diagnosis of celiac sprue (a condition in which the consumption of foods containing gluten prevents the body from absorbing certain nutrients), and put Plaintiff on a gluten-free diet (Tr. 708-09, 718). In August 2004, Plaintiff reported that her symptoms persisted (Tr. 705-06). Dr. Payne diagnosed Plaintiff with a probable exacerbation of celiac sprue or possible IBS (Tr. 705-07). He noted that Plaintiff likely had not adhered to her diet (Tr. 705). Dr. Payne prescribed medication and again put Plaintiff on a gluten-free diet (Tr. 706). Plaintiff did not show up for her next scheduled appointment and did not see Dr. Payne again (Tr. 704). In September 2004, a physician at the Murfreesboro Dermatology Clinic removed a site of squamous cell carcinoma (a common type of skin cancer arising from skin lesions) from Plaintiff's left leg (Tr. 529).

In November 2004, Dr. Spalding diagnosed Plaintiff with two ingrown toenails and apparently removed all or part of these toenails (Tr. 779-84).

In response to Plaintiff's complaints of periodic right knee pain since he performed her first arthroscopy in March 2003, Dr. K. Bruce Short performed a second arthroscopy and removed a portion of torn cartilage from her right knee in November 2004 (Tr. 548-51). On December 13, 2004, Plaintiff complained of minimal pain and was instructed to return in six weeks (Tr. 548).

6

That same day, Plaintiff complained of pain in her left first and third toenails, which were ingrown (Tr. 452-53). Plaintiff rated her pain at a level of 6 on a scale of 1 to 10 (Tr. 452-53). Dr. Spalding subsequently removed Plaintiff's left first and third toenails (Tr. 452-53).

In procedures performed in January and at various times throughout 2005, a physician at the Murfreesboro Dermatology Clinic removed sites of carcinoma from Plaintiff's right earlobe, right leg, left leg, left foot, lower back, and right chest (Tr. 512-16, 518-25).

On January 24, 2005, Plaintiff reported significant pain in the middle of her right knee (Tr. 548). Upon examining Plaintiff, Dr. Short noted that the range of motion in her right knee had improved since her surgery, and he diagnosed her with arthrofibrosis (excessive post-surgery scar tissue) (Tr. 548). He recommended a conservative course of treatment and advised her to return in six weeks if her knee pain had not "settled down" (Tr. 548). Plaintiff did not see Dr. Short again until December 6, 2006 (Tr. 548).

On February 9, 2005, Plaintiff first saw Dr. Christopher Lombardo, an ear, nose, and throat doctor, for her complaints of right ear pain (Tr. 545). Dr. Lombardo prescribed an anti-viral medication, and Plaintiff reported that it helped to relieve her pain (Tr. 544).

On April 18, 2005, Dr. Carol Phillips, a psychologist, performed a consultative examination of Plaintiff (Tr. 591-93). She diagnosed Plaintiff with mood disorder due to medical complaints with major depressive episode, recurrent/moderate (Tr. 593). Dr. Phillips opined that Plaintiff's ability to understand and recall simple work functions was not impaired; that her concentration, persistence, and ability to adapt to changes in her work routine or requirements were mildly to moderately impaired; and that her social interactive patterns were mildly impaired (Tr. 593). One week later, Plaintiff complained of pain in her neck, chest, and back (Tr. 280). Images

showed no abnormalities, and Dr. Petrochko opined that Plaintiff had no recurrent melanoma (Tr. 280, 312-13). He referred Plaintiff to Dr. Mangru, a rheumatologist (Tr. 280).

A May 27, 2005 MRI of Plaintiff's entire spine taken after she fell showed mild degenerative disc disease, but no fracture or dislocation of her cervical, thoracic, or lumbar spines (Tr. 215-16).

On June 3, 2005, Plaintiff saw Dr. Spalding for the first time since December 2004 (Tr. 442-53). Plaintiff complained of tenderness in her ingrown left first toenail, and rated her pain level as a 2 on a scale of 1 to 10 (Tr. 444-49). That same day, Dr. Spalding removed Plaintiff's left first toenail (Tr. 446). On June 27, 2005, Plaintiff reported that her toe was "fine" (Tr. 441).

In June 2005, Dr. Thomas Mullady performed a consultative examination of Plaintiff (Tr. 586-89). Dr. Mullady noted that Plaintiff had a mildly decreased range of motion in her lumbar spine, but a normal range of motion in all other joints; normal gait; some decreased strength in her right arm and right hand, but normal manual dexterity; full strength in her left arm and hand; and normal reflexes and sensation (Tr. 588). He noted Plaintiff's history of hypertension and melanoma in her right arm and her complaints of cervical and lumbar spine pain, but he indicated that her melanoma had not recurred; her hypertension was controlled with medication; and her examination revealed only mild findings as to her spine (Tr. 588). Dr. Mullady diagnosed Plaintiff with IBS, and he opined that she could occasionally to frequently carry or lift up to ten pounds and stand, walk, or sit for a total of six hours in an eight-hour workday (Tr. 589). He further opined that Plaintiff's IBS was the main factor affecting her ability to work (Tr. 589).

On July 19, 2005, Dr. Edward Sachs, Ph.D., completed a Psychiatric Review Technique form (PRTF) (Tr. 570-85), in which he opined that Plaintiff had a mild degree of limitation in her

8

activities of daily living and a moderate degree of limitation in social functioning and in

maintaining concentration, persistence, or pace (Tr. 580). He further opined that Plaintiff would

have some difficulty with extended concentration, but that she could still perform simple and

detailed tasks during a full work week; interact infrequently or one-on-one with the general

public; and adapt to gradual, infrequent changes (Tr. 585).

On July 28, 2005, a state agency physician, whose signature cannot be read but who is

asserted by the commissioner to be Dr. Celia Gulbenk, completed a Residual Functional Capacity

(RFC) form, in which she opined that Plaintiff could occasionally lift or carry up to 50 pounds

and sit, stand, or walk a total of six hours in an eight-hour workday (Tr. 559-69). She assessed

no other limitations (Tr. 566-69).

On August 31, 2005, Plaintiff saw Dr. Lombardo for the first time since February 2005

(Tr. 543). Dr. Lombardo removed a mass from her right earlobe (Tr. 542-43). In follow-up

appointments, Dr. Lombardo saw no residual tumors in Plaintiff's right earlobe (Tr. 541-42).

A September 15, 2005 MRI of Plaintiff's right knee showed that Plaintiff had previously

undergone two surgeries to remove torn cartilage from her knee and that she had some fluid on

her knee from the rupture of a small cyst, but was otherwise normal (Tr. 405-06).

On September 19, 2005, Dr. Lombardo removed a mass from Plaintiff's right earlobe (Tr. 540).

One month later, Plaintiff complained of "moderately severe" pain (Tr. 539). Dr.

Lombardo noted tenderness and swelling in Plaintiff's right earlobe, and he injected an anti-

inflammatory at the site of her pain (Tr. 539). At a follow-up appointment, Plaintiff reported

"partial resolution" of her swelling and pain, and Dr. Lombardo noted that it was less tender (Tr.

538).

Plaintiff saw Dr. Spalding on October 21, 2005 for the first time since June 2005 (Tr. 439-40). She complained of throbbing in her left first toenail and rated her pain level as a 6 on a scale of 1 to 10 (Tr. 439-40). That same day, Dr. Spalding completed a medical opinion form, in which he opined that Plaintiff could sit for eight hours and stand or walk for two hours in an eight-hour workday; occasionally lift or carry up to ten pounds; and occasionally stand on hard surfaces (Tr. 436-37). He further opined that Plaintiff would need to elevate her legs for 30 minutes three times a day; that Plaintiff would need to take more breaks than normally allowed in a workday; that Plaintiff could not reasonably be expected to work full-time; and that Plaintiff's medication would cause lapses in concentration each time she took it as needed (Tr. 436-38).

One week later, Dr. Spalding removed a portion of Plaintiff's left first toenail that had become ingrown (Tr. 432–35). A biopsy of the remaining tissue in Plaintiff's left first toenail was negative for any fungal elements (Tr. 426). On October 31, 2005, Plaintiff reported that she had severe post-operative pain in her left first toenail (Tr. 430-31). Dr. Spalding prescribed Percocet as needed (Tr. 429).

On November 2, 2005, Plaintiff complained of continued post-operative pain in her right earlobe (Tr. 537). Dr. Lombardo noted that Plaintiff's right earlobe was moderately tender and showed no sign of infection (Tr. 537). He prescribed an anti-inflammatory (Tr. 537). A November 15, 2005 MRI of Plaintiff's lumbar spine showed mild bone spurs; mild narrowing of some disc spaces; mild to moderate stenosis (narrowing) of the central canal; some disc atrophy; two bulging discs; and no nerve root impingement (Tr. 399, 401). An MRI of Plaintiff's thoracic spine taken the same day revealed some disc atrophy and very subtle disc bulges, but no nerve root or spinal cord impingement (Tr. 400).

10

One day later, Dr. Short completed a medical opinion form, in which he opined that Plaintiff could sit for 30 minutes at a time and for four hours total in an eight-hour workday; stand or walk for 15 minutes at a time and for two hours total; occasionally lift or carry up to ten pounds; occasionally reach above her shoulders; and infrequently bend at the waist and stand on hard surfaces (Tr. 556). He further opined that Plaintiff could not reasonably be expected to work full-time and her severe pain would cause frequent lapses in concentration (Tr. 557-58). On November 28, 2005, Plaintiff reported that she had tenderness in her left first toenail, which she rated as a 4 on a scale of 1 to 10 (Tr. 422). Dr. Spalding diagnosed Plaintiff with erythema (redness of the skin) and recommended applying a cream and bandage to the area (Tr. 422-23). The record shows that Plaintiff received no further treatment from Dr. Spalding.

On December 2, 2005, Dr. Jagindra Mangru, a rheumatologist, diagnosed Plaintiff with fibromyalgia because she suffered from diffuse pain; symptoms of a connective tissue illness or inflammatory arthropathy (joint disease); depression; sleep disorder; and a decline in her physical activity (Tr. 456). He prescribed Effexor (for depression) and Lyrica (for fibromyalgia); continued Plaintiff on physical therapy; and provided her educational materials on fibromyalgia. He recommended she continue physical therapy (Tr. 456). The record reflects no other documentation from Dr. Mangru.

On December 5, 2005, Dr. Lombardo removed a small lesion from Plaintiff's right earlobe (Tr. 535-36). On December 7, 2005, Dr. Lombardo completed a medical opinion form, in which he limited his opinion to Plaintiff's "evaluation/treatment [for and] diagnosis of basal cell carcinoma of the ear lobe and [her] post-operative pain only" (Tr. 458). Dr. Lombardo opined that Plaintiff could sit for 50 minutes at a time for a total of eight hours; stand for 30

minutes at a time for a total eight hours; had no lifting, carrying, or postural limitations; could "sometimes" be expected to be reliable in attending a full-time job; had moderately severe pain that could cause frequent lapses in concentration; and had a reasonable medical need to be chronically absent from full-time work (Tr. 460).  Dr. Lombardo further opined that Plaintiff required "follow-up and treatment for her chronic fibromyalgia, as it was more likely to be a problem with working" than the carcinoma on her right earlobe (Tr. 460).

Two weeks later, Plaintiff reported decreased tenderness in her right earlobe (Tr. 535). Dr. Lombardo opined that Plaintiff had a "normal post-op" and that her post-operative pain was "resolving slowly" (Tr. 535).  The record indicates that this was the last time Plaintiff saw Dr. Lombardo (Tr. 536-45).

On January 16, 2006, Plaintiff reported to a nurse practitioner (NP) at the Tracy Clinic that the psychotropic medication  Dr. Mangru prescribed worked well in relieving her fibromyalgia pain (Tr. 367).  One month later, Plaintiff reported that she had to stop taking the Lyrica and Effexor that Dr. Mangru prescribed (Tr. 364).  She further indicated that she was trying other methods of comfort for her elbow, back, leg, and neck pain, such as going to a chiropractor and using a heating pad, and would wait to get an orthopedic referral until she saw if these methods worked (Tr. 364).  Plaintiff reported that her insurance was unaffordable at this time (Tr. 364).

On October 16, 2006, Plaintiff went to the Tracy Clinic for a follow-up appointment (Tr. 258).  Upon examining Plaintiff, a nurse practitioner (NP) noted Plaintiff was well nourished and in no apparent distress with no musculoskeletal pain or irregularities; full muscle strength in all major muscle groups; and normal reflexes, motor functions, and sensation (Tr. 260).  The NP

12

provided Plaintiff with trigger point injections and continued her on Percocet as needed and prescribed Soma, a muscle relaxant (Tr. 260). Over one month later, Plaintiff complained of right knee pain after a fall (Tr. 254). On November 29, 2006, an NP noted that Plaintiff had a right leg limp and tenderness, swelling, and pain upon range of motion in her right knee; full muscle strength in all major muscle groups; and normal reflexes, motor functions, and sensation (Tr. 256). She continued Plaintiff on Percocet as needed (Tr. 257).

On December 12, 2006, Dr. Short reported that an MRI of Plaintiff's right knee showed moderate fluid and moderate arthritis, but no tear in her knee cartilage (Tr. 547, 552). He also noted a small cyst which did not need to be surgically removed (Tr. 547). Dr. Short further opined that Plaintiff suffered a sprain and a contusion from falling, which exacerbated her preexisting, but minimal arthritis (Tr. 547). He recommended conservative treatment and prescribed Percocet; an anti-inflammatory; and physical therapy (Tr. 547). Plaintiff sought no further treatment from Dr. Short.

On March 7, 2007, Plaintiff complained to an NP at the Tracy Clinic that she suffered from periodic flare-ups of pain from having to be in the hospital for long periods of time to visit her sick husband (Tr. 250). She rated her pain as an 8 on a scale of 1 to 10, and indicated that her activities of daily living (ADLs) were stable, her mood was assessed as stable on Lexapro (Tr. 250). The NP noted that Plaintiff had tenderness in twelve trigger points consistent with fibromyalgia, no spasms; a normal gait; full muscle strength in all major muscle groups; and normal reflexes, motor functions, and sensation (Tr. 252). She continued Plaintiff on Percocet as needed (Tr. 252).

One month later, Plaintiff reported to the Tracy Clinic that her pain medications worked

13

well without any side effects, but that she had not refilled them for over a month due to her husband's recent hospitalization (Tr. 242). She also reported that her ADLs were stable (Tr. 242). An NP noted that Plaintiff had tenderness at multiple unspecified trigger points; a normal range of motion; a normal gait; full muscle strength in all major muscle groups; and normal reflexes, motor functions, and sensation (Tr. 244). She added Gabitril, an anti-seizure medication to treat Plaintiff's unspecified myalgia and muscle inflammation, and continued her on Percocet as needed and Naproxen, an anti-inflammatory (Tr. 244-45).

On June 22, 2007, Plaintiff complained of right hip and knee pain, but indicated her mood was stable and her ADLs were stable (Tr. 234). An NP at the Tracy Clinic noted that Plaintiff had chronic back pain; right leg pain; arthralgias (joint pain) and myalgias at unspecified locations of her body; a decreased range of motion in her back and right hip and knee; a positive straight leg test on the right; a mild limp, but an intact gait; full strength in all major muscle groups; and normal reflexes, motor functions, and sensation (Tr. 234-36). She continued Plaintiff on Percocet as needed (for lower back pain), and added Voltaren and Medrol, two anti-inflammatories (for lumbar radiculopathy) (Tr. 237).

On August 2, 2007, Plaintiff complained of lower back and right knee pain, and an NP noted that she had chronic back pain; knee pain; and arthralgias and stiffness at unspecified locations of her body; a normal range of motion; a normal gait; full muscle strength in all major muscle groups; and normal reflexes, motor functions, and sensation (Tr. 232). She continued Plaintiff on Percocet as needed and Naproxen (Tr. 233).

On September 10, 2007, Plaintiff reported to the Tracy Clinic that her medications were "fair" at controlling her pain and that her ADLs were stable (Tr. 226). She requested a trigger

14

point injection to treat her complaints of right trapezius (shoulder blade) pain (Tr. 226). An NP noted that Plaintiff had chronic back pain and myalgias at unspecified locations of her body; a decreased range of motion in her back and right shoulder; a normal gait; full muscle strength in all major muscle groups; and normal reflexes, motor functions, and sensation (Tr. 228). She continued Plaintiff on Percocet as needed for lower back pain and Naproxen, and prescribed Flexeril, a muscle relaxant, for her unspecified myalgia and muscle inflammation (Tr. 227-29). Two months later, Plaintiff reported to the Tracy Clinic that her ADLs were stable and that her medications continued to work well and allowed her increased function (Tr. 218). An NP noted that Plaintiff had chronic back pain and myalgias at unspecified locations of her body; a decreased range of motion in her back; a mild limp, but an intact gait; full muscle strength in all major muscle groups; and normal reflexes, motor functions, and sensation (Tr. 220). She continued Plaintiff's medications (Tr. 219).

A November 18, 2007 pathology report showed that superficial basal cell carcinoma (a form of skin cancer) had been present on Plaintiff's right calf, but had been removed by microscopic shaving (Tr. 211-12). November 28, 2007 X-rays of Plaintiff's chest showed no cancer (Tr. 210). That same day, a site of squamous cell carcinoma was removed from Plaintiff's left thigh (Tr. 208).

On December 7, 2007, Dennis Ogrodowczyk, a chiropractor who periodically treated Plaintiff, opined that she continued to have flare-ups of chronic lower back and neck pain that "incapacitate[d] her and [made] her unable to perform her normal daily living activities" (Tr. 196). He further reported that Plaintiff had long experienced a pattern in which chiropractic treatment relieved her pain for a short time before she returned to being "symptom expressive"

15

and that manual manipulation seemed to provide her the most pain relief for the longest time period (Tr. 196). Mr. Ogrodowczyk indicated that Plaintiff was scheduled to return to him for treatment on an "as needed" basis (Tr. 196). Mr. Ogrodowczyk's records reflect that from the time of Plaintiff's alleged onset date of October 15, 2002 to the date of his opinion, he treated her a total of seven times. Prior to the alleged date of onset Plaintiff saw him five times related to injuries from falls or low back pain. Since her alleged onset date, three of the appointments were related to injuries from slipping or falling (Tr. 196-207, 771-77).

On January 21, 2008, Plaintiff complained of severe right scapular (shoulder blade) pain and right knee pain (Tr. 188). An NP noted that Plaintiff had tenderness in her right lower back and trapezius muscles; decreased range of motion in her back and neck; a slowed, but intact gait; a full range of motion with no palpable swelling in her right knee; full muscle strength in all major muscle groups; and normal reflexes, motor functions, and sensation (Tr. 188). She did not change Plaintiff's pain medications (Tr. 192).

Vocational Expert Testimony

The vocational expert (VE) testified that Plaintiff's past relevant positions as a pharmacy technician and as a sales clerk were low-level semi-skilled and performed at the light exertional level (Tr. 847-48). The VE testified that a person of the same age, education, and vocational background as Plaintiff who was capable of performing work at the light exertional level and who had a limited but satisfactory ability to deal with the public, maintain attention and concentration, respond appropriately to work changes, and complete a normal work week could return to Plaintiff's previous relevant work (Tr. 848).

<u>Analysis</u>

1.  Did the ALJ err by rejecting disabling medical opinions from three of Plaintiff's treating specialists?

Plaintiff contends the ALJ failed to accord the proper weight to the opinion of three physicians:

Robert Spalding, D.P.M., Plaintiff's treating podiatrist, completed a Medical Opinion Form ("MOF") dated October 21, 2005.  Plaintiff contends they reflect limitations most consistent with a reduced range of part-time sedentary work (Tr. 436–38).

On November 15, 2005, Dr. Short completed an MOF that also endorsed limitations inconsistent with any full time work activity (Tr. 270–72).  In that assessment, Dr. Short opined, among other things, that Plaintiff would suffer from severe pain, would be incapable of a full time work schedule, and that Plaintiff's subjective complaints were reasonable in view of his observations and diagnosis.

Finally, the ALJ rejected the disabling MOF completed by treating Ear, Nose and Throat specialist Christopher Lombardo, M.D. dated December 7, 2005 (Tr. 17–18).  Dr. Lombardo's MOF contains a disclaimer at the top of his opinion that his opinion is limited to his treatment for basal cell carcinoma of the ear lobe and post-operative pain only (Tr. 458–60).  Dr. Lombardo's assessment was that Plaintiff could lift or carry as much as 50 pounds or more frequently (her exertional limitations), but was of the opinion  that Plaintiff would experience moderately severe pain; lapses in concentration for several hours on three or more days per week; and would be incapable of meeting the demands of full-time work activity.

The Commissioner argues the ALJ reasonably found that all of these physicians' opinions

17

were inconsistent with and unsupported by the objective medical evidence, including their own records. According to the Commissioner, Plaintiff's objective medical tests and clinical examinations revealed mostly mild or minimal findings and the record also demonstrates Plaintiff's impairments were adequately controlled by medication or corrected with surgery.

At the outset, I note the responsibility for weighing the evidence, including physicians' opinions, and resolving conflicts therein rests with the ALJ. *See Richardson*, 402 U.S. at 399 ("We . . . are presented with the not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve that conflict."); *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (it is the ALJ's duty to resolve conflicts in the evidence).

As Plaintiff argues, it is well settled that opinions of treating physicians, because of their longitudinal history of caring for patients, are entitled to great weight and are generally entitled to greater weight than contrary opinions of consulting physicians who have examined plaintiffs only once. *Walters v. Commissioner of Social Security,* 127 F.3d 525, 529-30 (6th Cir. 1997); *Ferris v. Secretary of Health and Human Services*, 773 F.2d 85, 90 (6th Cir. 1985); *Harris v. Heckler*, 776 F.2d 431, 435 (6th Cir. 1985). *See also*, 20 C.F.R. § 404.1527(d)(2) (giving more weight to the opinions of treating sources generally). 20 C.F.R. § 404.1527(d)(2) sets forth factors to be considered: (1) the frequency of examination and the length, nature and extent of the treatment relationship; (2) the evidence in support of the opinion; (3) the opinion's consistency with the record as a whole; and (4) whether the opinion is from a specialist.

However, the Commissioner is not bound by a treating physician's assessment in all situations. The weight to be given the physician's opinion depends on the extent to which it is supported by objective medical signs and laboratory findings and to the extent that it is consistent

18

with the record as a whole. 20 C.F.R. §§404.1527(d), 416.927(d); *accord Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 287 (6th Cir. 1994). The Commissioner may reject unsupported opinions or opinions inconsistent with other substantial evidence in the record and resolve conflicts in the evidence. *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). *See also* 20 C.F.R. §§ 404.1527(d) and 416.927(d). Furthermore, physicians' opinions about the ultimate issue of disability are entitled to no particular weight; rather, this issue is reserved for the Commissioner. *See* 20 C.F.R. § 404.1527(e)(1) (The Commissioner is responsible for making the determination about whether a claimant meets the statutory definition of disability); Social Security Ruling (SSR) 96-5p. In this case, I conclude the ALJ had a reasonable basis to reject the disabling limitations of these physicians.

An ALJ must give controlling weight to a treating physician's opinion only if it is both well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence of record. 20 C.F.R. § 404.1527(d)(2); Social Security Ruling (SSR) 96-2p*; Combs v. Comm'r of Social Security*, 459 F.3d 640, 652 (6th Cir. 2006) (en banc). Here, the ALJ reasonably found that all of these physicians' opinions were inconsistent with and unsupported by the objective medical evidence, including their own records. Plaintiff's objective medical tests and clinical examinations revealed mostly mild or minimal findings. There is evidence in the record from which one could conclude Plaintiff's impairments were adequately controlled by medication or corrected with surgery.

The Commissioner points to the following: When Plaintiff periodically complained of pain in some of her toenails from August 2002 through October 2004, Dr. Spalding diagnosed her with

19

fungal infections and treated these infections rather conservatively by prescribing an anti-fungal antibiotic (Tr. 778-812). Beginning in approximately December 2004, Dr. Spalding diagnosed Plaintiff with ingrown toenails in her first and third left toes, and he removed all or a portion of one or both of these toenails in December 2004, June 2005 and October 2005 (Tr. 441-53, 779-84).

On October 21, 2005, Dr. Spalding, like Drs. Short and Lombardo, was asked to opine as to Plaintiff's work capacity as of December 31, 2003, her DLI (Tr. 436-38). Dr. Spalding opined that Plaintiff would need to elevate her legs for 30 minutes three times a day; that she could not reasonably be expected to work full-time; and that her medication would cause lapses in concentration each time she took it as needed (Tr. 436-38). The ALJ rejected this opinion because Dr. Spalding was asked to opine as to Plaintiff's work capacity as of December 2003, but he did not even begin treating her for ingrown toenails until December 2004 (Tr. 18).[5] I conclude the ALJ reasonably found that Dr. Spalding's opinion regarding Plaintiff's limitations as of December 2003 was not supported because until December 2004, he had diagnosed her with fungal toenail infections for which he prescribed only an antibiotic (Tr. 441-53, 779-84).

Moreover, as the ALJ noted Plaintiff had an ingrown toenail removed in October 2005 (Tr. 18, 426-35). Dr. Spalding removed all or a portion of Plaintiff's first left ingrown toenail one week after he provided his opinion and scheduled this procedure the same day he rendered his opinion (Tr. 426-35). The ALJ noted, Dr. Spalding did not remove any toenails after October 2005, suggesting that Plaintiff's pain from her ingrown toenails was not as limiting as she alleged or as

---

[5] Although it appears from his treatment notes that Dr. Spalding first began treating Plaintiff for fungal infections in her toenails in August 2002, he did not remove any of Plaintiff's ingrown toenails until November or December 2004 (Tr. 441-53, 779-84).

20

Dr. Spalding opined (Tr. 18, 426-35).[6]  An October 2005 biopsy of the remaining tissue in

Plaintiff's left first toenail was negative for any fungal elements (Tr. 426).

Plaintiff argues that the ALJ essentially provided no reason for rejecting Dr. Spalding's

opinion; however, as discussed above, that is not the case (Doc 12, Plaintiff's Brief p. 11; Tr. at 18).

In rejecting Dr. Spalding's opinion the ALJ noted:

> Treatment notes from podiatrist Dr. Spalding show that, due to ingrown toenails, the
> claimant underwent removal of the first toenail in December 2004, June 2005 and
> again in October 2005.  However, the claimant apparently has not returned to Dr.
> Spalding for further treatment, which suggests that her residual symptoms are not as
> limiting as she alleged.  In October 2005, Dr. Spalding essentially opined that, prior
> to December 31, 2003, the claimant could not have been reliable in attending an
> eight-hour a day, 40 hour workweek due to the degree of pain and other limitations
> that she experienced.  However, clinical records indicate that Dr. Spalding did not
> begin treating the claimant until December 2004; thus, no weight is given to this
> opinion (Ex. section F, pp. 271-273; 373-373; 377-387; 391-404)

(Tr. 18).

Plaintiff also argues if the ALJ found that Dr. Spalding's opinion was ambiguous or

applied only to her functioning before her DLI, she should have re-contacted him to determine the

timeframe to which his opinion applied (Br. at 11-12).  However, regardless of the timeframe to

which Dr. Spalding opined, Plaintiff's conservative treatment history with Dr. Spalding was not

ambiguous, and as the ALJ reasonably noted, it does not support his severe opinion (Tr. 18, 426-53,

779-84).

The ALJ also reasonably rejected Dr. Short's November 2005 opinion as inconsistent with

---

[6]  Plaintiff did attend follow-up appointments with Dr. Spalding, and at her last
appointment in November 2005, she reported that the surgical area was tender (Tr. 422-23). She
rated her level of pain as a 4 (Tr. 422).  Dr. Spalding diagnosed Plaintiff with erythema (redness
of the skin) and recommended applying a cream and bandage to the area (Tr. 422-23).

21

and unsupported by the objective medical evidence, Plaintiff's treatment history, and Dr. Short's own diagnoses (Tr. 17). Shortly after he performed a second arthroscopy on Plaintiff's right knee in December 2004, Dr. Short recommended a conservative course of treatment and advised her to return in six weeks if her knee pain had not "settled down"(Tr. 548). As the ALJ noted, Plaintiff did not see Dr. Short again until approximately two years later (Tr. 548). The ALJ therefore reasonably found that this suggested that Plaintiff's post-operative knee pain had subsided (Tr. 17).

On December 12, 2006, the last time Dr. Short treated Plaintiff, he reported that an MRI of her right knee showed moderate fluid and moderate arthritis, but no tear in her knee cartilage (Tr. 547, 552). As the ALJ noted, Dr. Short also diagnosed Plaintiff with a sprain and a contusion from a fall which exacerbated her pre-existing, but minimal arthritis in her right knee (Tr. 547). Dr. Short recommended conservative treatment, and Plaintiff sought no further treatment from him (Tr. 547). Further, Dr. Short provided his opinion at a time when he had not even seen Plaintiff for almost one year (Tr. 548). Finally, the ALJ reasonably pointed to very recent treatment notes from the Tracy Clinic, in which Plaintiff reported that her prescribed pain medication continued to work well in treating her pain and in increasing her functioning (Tr. 16, 218). The ALJ therefore reasonably found that Dr. Short's severely restrictive opinion, in which he opined that Plaintiff could not perform even the exertional demands of sedentary work, was inconsistent with and unsupported by the medical evidence (Tr. 17, 556-58).

In her brief, Plaintiff argues that substantial evidence did not support the ALJ's rejection of Dr. Short's opinion because he made only a "passing" reference that Plaintiff's right knee was minimally symptomatic (Br. at 7). However, Dr. Short provided more than a passing reference to Plaintiff's minimal arthritis in her right knee (Tr. 547). He, in fact, diagnosed her with a sprain that

only exacerbated her pre-existing, but minimal arthritis (Tr. 547).  In rejecting Dr. Short's opinion, the ALJ also pointed to Plaintiff's failure to seek any treatment for her right knee for two years and the mild results from an MRI of her right knee on which Dr. Short based his December 2006 diagnosis (Tr. 17, 547, 552).

Plaintiff also argues that the ALJ "cherry picked" from Plaintiff's treatment records at Tracy Clinic in noting that her medications relieved her pain (Br. at 12; Tr. at 16-17).  In rejecting Dr. Short's opinion, the ALJ cited to treatment notes from November 2007, in which Plaintiff reported that her ADLs were stable, and that her medications continued to work well and allowed her increased function from her complaints of pain (Tr. 218).  These treatment notes were the most recent report as to Plaintiff's complaints of pain other than those from a January 2008 appointment, and Plaintiff made a similar report in April 2007 (Tr. 188-92, 218).  At her January 2008 appointment, Plaintiff did complain of right knee pain (Tr. 188).  However, an NP at the clinic noted that Plaintiff had a full range of knee motion with no palpable swelling in her right knee and normal reflexes, motor functions, and sensation (Tr. 188).  Plaintiff's course of treatment at Tracy Clinic was rather conservative. She was primarily and consistently prescribed Percocet, as needed, and the anti-inflammatories of Naproxen and Flexeril for her complaints of pain (Tr. 192, 218-19, 227-29, 233, 244-45, 252, 257; Br. at 12).  Further, the ALJ detailed several other reasons for rejecting Dr. Short's opinion (Tr. 17; Br. at 7, 12).

Finally, the ALJ reasonably rejected Dr. Lombardo's December 2005 opinion as inconsistent with the objective medical evidence (Tr. 17-18).  On December 7, 2005, Dr. Lombardo opined that Plaintiff could only "sometimes" be reliable in attending a full-time job and had moderately severe pain that could cause frequent lapses in concentration (Tr. 458-60).  As an initial

matter, to the extent that Dr. Lombardo opined as to Plaintiff's work capacity before her DLI of December 31, 2003, the ALJ reasonably found that such an opinion was inconsistent with the record, as Dr. Lombardo did not even begin treating Plaintiff until February 2005 (Tr. 17-18, 544-45). Further, as the ALJ noted, Dr. Lombardo emphatically limited his opinion only to his treatment of Plaintiff's carcinoma in her earlobe and her post-operative pain (Tr. 458). Indeed, Dr. Lombardo had removed a lesion from Plaintiff's right earlobe only two days earlier (Tr. 535-36).

The ALJ also reasonably considered that at an appointment two weeks later, Dr. Lombardo noted that Plaintiff's post-operative pain had decreased, that she sought no further treatment from Dr. Lombardo after this appointment, and that the record showed no evidence of subsequent carcinoma in her right earlobe (Tr. 17, 534-35). In his Decision the ALJ considered the opinion of Dr. Lombardo:

> Medical records confirm the claimant's report that she has had numerous shave skin biopsies beginning in 1999, some of which proved to be basic (sic) cell cancer and some squamous cell cancer in situ. Records from Dr. Lombardo indicate that this physician performed a number of surgical procedures to Ms. Cordell's right earlobe, due to basal cell carcinoma between February 2005 and December 2005. The claimant last saw Dr. Lombardo in December 2005, at which time the physician noted that the claimant's post-operative pain was resolving. Clinical records show that there has been no evidence of residual malignancy or metastasis since that time. In December 2005, Dr. Lombardo essentially opined that prior to December 31, 2003, the claimant could have performed a range of medium work, but that she would have lapses in concentration or memory several hours three or more days a week and that she would be absent from a full time work schedule on a chronic basis. (Ex. section F, pp. 281-291; 366-368) No weight is given to this opinion, as it is internally inconsistent. Dr. Lombardo's opinion was stated as being based on the claimant's evaluation/treatment of basal cell carcinoma of the ear lobe and her post-operative pain only; while the record shows that Dr. Lomabardo did not begin treating the claimant until February 2005.

(Tr. 17). I conclude the ALJ's decision in rejecting the disabling opinion of Dr. Lombardo is

24

supported by substantial evidence.

Other evidence of record included the June 2005 consultative examination of Dr. Mullady. He noted that Plaintiff had a mildly decreased range of motion in her lumbar spine, but a normal range of motion in all other joints, normal gait, some decreased strength in her right arm and right hand, but normal manual dexterity, full strength in her left arm and hand, and normal reflexes and sensation (Tr. 588). He noted Plaintiff's history of hypertension and melanoma in her right arm and her complaints of cervical and lumbar spine pain, but he indicated that her melanoma had not recurred, her hypertension was controlled with medication, and her examination revealed only mild findings as to her spine (Tr. 588). Dr. Mullady diagnosed Plaintiff with IBS, and he opined that she could occasionally to frequently carry or lift up to ten pounds and stand, walk, or sit for a total of six hours in an eight-hour workday (Tr. 589). He further opined that Plaintiff's IBS was the main factor affecting her ability to work (Tr. 589).

On July 28, 2005, a state agency physician completed a Residual Functional Capacity (RFC) form in which she opined that Plaintiff could occasionally lift or carry up to 50 pounds and sit, stand, or walk a total of six hours in an eight-hour workday (Tr. 559-69). She assessed no other limitations (Tr. 566-69).

Thus, based on the above facts, I conclude the ALJ was reasonable in declining to defer to these physicians' opinions, and she properly discounted the opinions as inconsistent with and unsupported by the objective evidence of record and these physicians' own records. *See Warner v. Comm'r of Social Security*, 375 F.3d 387, 390-91 (6th Cir. 2004) (finding that "[t]reating physicians' opinions are only given such deference when supported by objective medical evidence."). The fact that these physicians' opinions diverged from the objective evidence of

record (including their own records) is a valid, legally supportable reason for discounting their opinions. 20 C.F.R. § 404.1527(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give that opinion."); *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 287 (6th Cir. 1994) ("The Secretary . . . is not bound by the treating physicians' opinions, especially when there is substantial medical evidence to the contrary.") (citation omitted). Contrary to Plaintiff's unsubstantiated claims, the ALJ therefore provided "good reasons" for discounting these physicians' opinions in conformance with the regulations and *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 545 (6th Cir. 2004). Substantial evidence therefore supports the ALJ's rejection of these physicians' opinions.

Plaintiff also argues the ALJ supported her decision by referring only to the mild to moderate results from MRIs of her lumbar spine, thereby ignoring the unique nature of fibromyalgia (Br. at 12). In her decision, the ALJ specifically addressed Plaintiff's fibromyalgia but noted that Plaintiff reported in January 2006 that the medications which Dr. Mangru, a rheumatologist, prescribed one month earlier worked well in relieving her fibromyalgia (Tr. 16, 367). The ALJ also reasonably considered that, in one of Plaintiff's most recent visits to the Tracy Clinic, she reported her prescribed pain medication "continue[d] to work well and allow her increase[d] function" (Tr. 16, 218). Further, as the ALJ correctly noted, the record shows that Plaintiff last saw Dr. Mangru in December 2005, which suggests that her fibromyalgia pain was not as disabling as she alleged (Tr. 16, 456). Thus, contrary to Plaintiff's claims, the ALJ did not even refer to, much less rely on, any of the myriad of mild objective medical evidence in finding that Plaintiff's fibromyalgia was not disabling, and substantial evidence supports this finding (Tr. 16-19).

26

A diagnosis, without more, does not automatically entitle a plaintiff to disability benefits. *Vance v. Comm'r of Social Security*, No. 07-5793, 2008 WL 162942, *4 (6th Cir. Jan. 15. 2008) ("[A] diagnosis of fibromyalgia does not automatically entitle Vance to disability benefits . . . .") (emphasis in original). A plaintiff must do more to establish a disabling impairment than merely show its presence. *Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990). Here, in a single treatment note from December 2005, Dr. Mangru diagnosed Plaintiff with fibromyalgia and prescribed a rather conservative course of care consisting of psychotropic medications and continued physical therapy, and the next month Plaintiff reported that this conservative treatment had relieved her fibromyalgia pain (Tr. 456).

Finally, Plaintiff argues at least two of her treating specialists were aware of her fibromyalgia (Br. at 12-13). To the extent that Plaintiff alludes to Dr. Lombardo's opinion that her fibromyalgia was likely more limiting than the carcinoma he removed from her right earlobe, Dr. Lombardo is an ear, nose, and throat specialist, not a rheumatologist, and did not treat Plaintiff for fibromyalgia (Tr. 458-60). Moreover, as previously noted, Dr. Mangru, the only rheumatologist who treated Plaintiff, provided a one-page record and last treated Plaintiff in December 2005 (Tr. 16, 456). In Dr. Mullady's consultative examination there is reference to complaint of low back and neck pain and a diagnosis of arthritis, but Plaintiff's chief complaint was unrelated to this condition (Tr. 586-87). Thus, I conclude the ALJ reasonably found that Plaintiff's fibromyalgia was not disabling. Substantial evidence supports this finding.

2. Did the ALJ err by failing to address and discuss the treating source opinion and treatment records from Plaintiff's treating chiropractor, in violation of SSR 06-03p?

Plaintiff argues the ALJ did not reference the December 2007 opinion provided by Mr.

27

Ogrodowczyk, her treating chiropractor, which she claims further established the existence of her pain and her efforts to obtain pain relief (Br. at 13-14). However, I conclude the ALJ's failure to reference the treatment of Mr. Ogrodowczyk was not reversible error.

As Plaintiff acknowledges, Mr. Ogrodowczyk was not a "treating source" whose opinion was eligible to be accorded controlling weight. 20 C.F.R. §§ 404.1502, 404.1513(a) and 404.1527(d)(2); SSR 06-03p. Rather, the Agency's regulations provide that as an "other source," Mr. Ogrodowczyk may provide evidence to show the severity of Plaintiff's impairments and how they affect her ability to function. 20 C.F.R. § 404.1513(d); SSR 06-03p.

Mr. Ogrodowczyk opined that Plaintiff's flare-ups of lower back and neck pain "incapacitate[d] her and [made] her unable to perform her normal daily living activities" (Tr. 196). He further reported that chiropractic treatment relieved Plaintiff's pain for a short time before she returned to being "symptom expressive" (Tr. 196). He concluded that she "continue[d] to function under duress during her normal daily living routine." These opinions follow the comment "subjective" (Tr. 196).

The Commissioner argues Mr. Ogrodowczyk's opinion and his references to Plaintiff's incapacitation and functioning under duress are, at best, conclusory (Tr. 196). To the extent that they suggest that Plaintiff was disabled, they were not medical opinions, as the ultimate determination of disability is a question reserved to the Commissioner. See 20 C.F.R. § 404.1527(e)(2); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (holding that the determination of disability is the prerogative of the Commissioner, not the treating physician). Moreover, the remaining statements indicate that they were not opinions so much as they were simply a record of Plaintiff's subjective complaints. In addition, in his treatment notes, Mr.

28

Ogrodowczyk did not opine as to what Plaintiff could do despite her impairments. Even Plaintiff claims that this treatment note only "further establishes the existence of [her] pain and [her] efforts to obtain pain relief" (Br. at 13-14). I agree with the argument of the Commissioner and conclude this treatment note was cumulative of other evidence.

Finally, although Mr. Ogrodowczyk indicated that he has been Plaintiff's chiropractor since 1988, his records reflect that from the time of her alleged onset date of October 15, 2002 to the date of his opinion, he treated her a total of only seven times. Prior to the alleged date of onset Plaintiff saw him five times related to injuries from falls or low back pain. Since her alleged onset date, three of the appointments related to injuries from slipping or falling (Tr. 196-207, 771-77). Moreover, significant periods of time lapsed inbetween Plaintiff's appointments since her alleged disability onset date – September 2003, October 2004, June 2005, February 2006, March 2007, December 2007, and January 2008 (Tr. 196-207, 771-77).

For all these reasons, the ALJ's omission in her decision of Mr. Ogrodowczyk's December 2007 treatment notes was harmless error.

In this case the ALJ rejects the opinion of three physicians but gives good reasons for doing so. As stated above, the standard of judicial review by this Court is whether the findings of the Commissioner are supported by substantial evidence. Even if there is evidence on the other side, if there is evidence to support the Commissioner's findings, they must be affirmed. The Court may not reweigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard allows considerable latitude to administrative decision makers. It presupposes there is a zone of choice within which the decision makers can go either way, without interference

by the courts. I conclude the Decision of the ALJ is supported by substantial evidence.

Conclusion

Having carefully reviewed the entire administrative record and the briefs of the parties filed in support of their respective motions, I conclude there is substantial evidence in the record to support the findings of the ALJ and the decision of the Commissioner, and neither reversal nor remand is warranted on these facts. Accordingly, I RECOMMEND:

(1) The plaintiff's motion for judgment on the pleadings (Doc. 11) be DENIED.

(2) The defendant's motion for summary judgment (Doc. 15) be GRANTED.[7]

(3) The case be DISMISSED.

Dated: January 13, 2010                    s/William B. Mitchell Carter
                                           UNITED STATES MAGISTRATE JUDGE

---

[7]Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S.Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).